### MALSTER and another *v.* HUMPHREYS and others.

*(Circuit Court, D. Maryland.* July 16, 1880.)

1. COLLISION—LAUNCH—NEGLIGENCE.—The launch of a ship is an extraordinary and unusual proceeding, and the builder is therefore required to take extraordinary care, and exercise the highest caution, to prevent damage to those who are navigating the harbor.

Facts of collision between a schooner and a launched ship reviewed in this case, and the builder *held* liable for negligence.

In Admiralty. Appeal from district court.

*John H. Handy*, for libellants.

*Savage & Semmes* and *A. Sterling, Jr.*, for respondents.

The facts in this case are fully set out in the opinion of the district court, (filed October 22, 1879,) which is as follows:

MORRIS, D. J. This is a collision case of a peculiar character. As to the facts, there is but little, if any, dispute. It appears that on the afternoon of the first day of July, 1879,

the schooner Ridie, of about 55 tons, with a cargo of assorted merchandise, started from the upper part of the harbor of Baltimore on her trip to Salisbury, on the eastern shore of Maryland, and, the wind being from the south-east, she was obliged to beat out; that having got about the Locust Point coal wharves she went on her starboard tack in a north-easterly direction, heading for a point on the opposite shore somewhere between Abbott's rolling mills and the ship-yard of Malster & Reaney, the respondents. She had nearly run out that tack, being about 200 yards from the shore, and was in the act of going about, being in stays, her sails not yet filled on her port tack, when she was run down and sunk by the hull of a vessel launched from the ship-yard of the respondents. The launch proved to be the hull of the propeller Arbutus, which the respondents had built for the United States government. There were on deck of the schooner, at the time, Captain Malone, the master; William H. Brewington, the mate; James Turner, a deck hand, who was forward working the jib and acting as lookout; and two passengers, George Twigg and Henry Messig. These all testify that no one of them had any knowledge, until too late to be of any avail to them in preventing the disaster, that there was to be a launch, and that there was no signal or warning of any kind given that attracted their attention until too late.

The first one of these who noticed the preparations and unusual collection of people about the ship-yard was the passenger George Twigg, who was standing forward with the lookout, Turner, and who testifies that just before the collision, and just as the schooner was in the act of going about, his attention was attracted by hearing hallooing on the shore, and he said to Turner that he thought there was going to be a launch, and almost immediately afterwards the launch started and struck them within about half a minute. Turner testifies that he observed the hull just about the time that the passenger Twigg called his attention to it, which was just as the schooner was going about, and when, if they had thought it necessary, it would have been too late to put the

schooner back on her course; that he saw the people standing about in the ship-yard, and a flag on the hull, and some people aboard of her, but nothing to indicate that the launch was to take place immediately; that it was not over half a minute from the time he saw her until the hull started off the ways.

The other passenger, Henry Messig, a colored man, testified that he was also standing forward, and had been looking at the hull in the ship-yard for some minutes before the collision, but called no one's attention to it; that he did not see anything to indicate that the launch was to take place at that time until the schooner was in stays and the launch had started; that he was somewhat familiar with launches, having been several times present at them.

Captain Malone, who had the helm, testified that he had not heard that there was to be a launch, and knew nothing of it until he was in the act of going about, when the mate spoke to him and said he thought there was to be a launch, but not speaking as if it was to be immediately, or as a warning.

The mate testified that he did not notice anything going on in the ship-yard until the captain had put the helm down to go about, and he crossed over to the port quarter, and that he then noticed it and mentioned it to the captain, but that he did not think, and had no reason to think, the launch was to be immediately; that all he saw was a flag on the hull, and the people collected there, and about the same time he heard three whistles, but did not know what they indicated; that when he first observed the hull it was too late to have put the schooner back on her course.

There were other corroborating witnesses, but it is not necessary to notice their testimony, or to mention more in detail the facts testified to by the persons on the deck of the schooner, as the testimony of Mr. Malster himself, and the other witnesses for the respondents, give substantially the same account of the collision, and give more accurately the intervals of of time between the events occurring just before the collision.

It appears, from the testimony of Mr. Malster and his wit-
nesses, that it was generally understood about that part of
the harbor of Baltimore, and had been noticed in the local
items of the city newspapers, that he was to launch the gov-
ernment propeller Arbutus, a vessel of about 150 tons, from
his ship-yard at Canton, at 4 o'clock on that afternoon; that
he had a flag put upon the hull about 10 o'clock that morn-
ing, which is generally known to indicate a launch, and that
early in the afternoon he gave instructions to have all the
vessels anchored in dangerous proximity to the line of the
launch notified to remove, which was done; that he had
intended to launch at 4 o'clock, but waited until 5 for the
tide; that about 4 o'clock they began knocking away the props
and bilge blocks, and wedging up the hull, and at 5 o'clock
were all ready, and the vessel was only held back by two trip-
pers, which are timbers so placed as to prevent the vessel
moving until they are cut away; that, being all ready and about
to saw away the trippers, he looked out on the water, to be
sure the course was clear, and he then saw the schooner Ridie
steering in a diagonal course across the line to be taken by
the launch, and then very near to that line; that he called to
his men to wait, although the hull had already begun to creak
and show signs of uneasiness, and it was always a risky thing
to do, to hold back a launch when she was prepared to let
go; that they did wait until he saw the schooner cross the
line and get to leeward, when, having every reason in his own
mind to suppose that she would continue her course and be
getting further and further out of danger, he gave orders to
cut away the trippers; that the launch started very slowly at
first, but when she got under way went very rapidly; that
the schooner did not, as he had reasonably supposed she
would, keep her course, but immediately after crossing the
line of the launch went about and came on to it again and
was run down, although she might have continued her tack
in the same course safely some 200 yards further in towards
the shore.

He further testified that he had a steam-tug lying at the

wharf, near the stern of the launch, ready to go after the hull and bring her back to shore as soon as she had lost the most of her momentum; and that the use of hawsers or anchors to check the course of a launch was not by many ship-builders considered advisable, as many accidents occurred from the use of them, and that no hawser or line which it was practicable to use could have checked the Arbutus before she reached the point where she struck the schooner. The captain of the tug, who was one of the respondent's witnesses, testified that he was lying at the wharf at the stern of the launch, with the head of his tug out towards the water, and that he gave three blasts of his whistle just as the launch started, and one of the hands on the tug testified that just before the launch Mr. Malster called to him to forward and hail that schooner and warn him off; that the schooner was then still on her starboard tack, heading for Tyler's wharf; that he did go forward on the tug, and hallooed, and continued to halloo until the tug blew her steam-whistle, but he could not see that any one on the schooner noticed him; that when he began to halloo the schooner had not reached the line of the launch, and when the launch struck the water the schooner had gone about and was in stays.

It is clear from the testimony that the schooner went not more than her length across the line of the launch before she went about, and that she must have started to go about just as the launch got started on the ways. It would, therefore, appear that Mr. Malster, seeing the schooner about to cross the line of the launch, and knowing that if she continued her course she would be clear of all danger before the launch could reach her, (if the launch took the course he expected,) and feeling that every moment's detention of the launch was a great risk, and feeling confident, no doubt, that the schooner either knew of the launch or would hear the shouting he directed to be made from the tug, he took for granted that the schooner would continue her course, without waiting to see her get so far clear of the line as that she could not get back on it in time to be struck. In so doing, no doubt, Mr.

Malster acted as most ship-builders would have acted under the same circumstances.

There were many experienced men engaged in that responsible business produced as witnesses to testify as to the usual precautions at launches, and the tendency of their several experiences and methods was to show that the launching of a ship of any considerable size was an event which usually excited considerable interest in the neighborhood of the ship-yard, and about the harbor; that there was usually a considerable crowd of persons on the neighboring shores and wharves, and out on the water in boats, watching for it; that it usually became known by general report and local items in the newspapers, and that the only special notice to the public that the ship-builder gave was to set up a flag on the hull during the day, and to see that vessels lying at anchor in the course of the launch were removed; that vessels which might be passing at the time of the launch got notice and warning from the spectators who were waiting on the wharves or out in boats, and that any collision with a passing vessel was almost unheard of; that the moment of launching was a time of great anxiety and responsibility to the ship-builder and all in his employment, and usually absorbed all their attention, and that they never knew of boats being stationed off in the water to give notice to passing vessels, or of any notice other than that mentioned; that hawsers and anchors, when used, were rather for the purpose of preventing the hull from drifting too far away, and of furnishing the means of bringing her back to the shore, than of preventing her running into passing vessels.

It would not appear, therefore, that Mr. Malster set about the launching of this vessel with, for a ship-builder, any unusual inattention to the risk to passing vessels; but the court is not satisfied that he took such precautions as the law should require a man to take before he does an act so fraught with danger to others as to launch a vessel several hundred yards out into a frequented harbor where ships have a right to be sailing. There was, in reality, no

notice at all given by him, which deserves in law to be so considered.

The respondents rely as notice upon the fact that there was a flag up on the hull, which they claim all sea-faring people know indicates a launch. By their own showing this flag was put up about 10 o'clock in the morning, and the actual launching did not take place until 5 P. M.; and it is claiming too much to say that the mere sticking up a flag is any sufficient notice to blockade the harbor of a great commercial port for a whole day for such a purpose. They rely also upon the fact that the preparations for launching involve pounding upon the sides of her hull to wedge her up, which makes a loud and peculiar noise, and which they say ought to attract any passing vessel's attention, and should be a notice that a launch was about to take place. But they themselves say that this driving of wedges began fully an hour before the actual launching, and it probably was concluded before the schooner got into the position where her crew would have heard it, even if they had known its significance.

They claim that, having before their ship-yard a large sheet of water, with a distance of perhaps a thousand feet to Henderson's wharf, which is in a straight line opposite, they were not to be expected to take precautions which ship-yards in more contracted places require. But this very extent of clear space turned out to be an element of danger, for the schooner having a perfect right to sail over any part of it, it was the most natural thing for her, as the wind then was, to make her long tack over into it; and if it had been narrower there would have been more chance that some spectator or boatmen near the launch, and who was doing nothing but watching it, might have warned them in time. As it was, those spectators who were nearest to the schooner, although at considerable distance from her, and who, having had information that the launch was to be at 4 o'clock and were still watching for it, state that, until they saw the hull moving, there was nothing which to them, at the distance they were off, indicated that the moment for launching had come. There was

no gun fired, no whistle blown, no shouting heard, until after the launch had started. It can hardly be seriously contended, therefore, that any sufficient notice was given.

The captain and crew of the schooner state that they had no information or knowledge whatever with regard to any general expectation that there would be a launch that afternoon, and that they saw nothing until too late to put them on their guard, and the captain says he went about because he had run on that tack as far as he thought best to go, and that, although he could have gone further, he thought it more prudent in that part of the harbor not to do so.

It is to be remembered that the respondent's ship-yard is not an isolated object on the shore, but it is surrounded by large manufacturing establishments, many of which are conspicuous objects, and, with the noise of their machinery, quite as likely to attract attention as a ship-yard.

When it is considered how slight a precaution would have entirely prevented all risk of such a disaster as the one which has given rise to this litigation, the neglect becomes more and more manifest. A simple tug-boat, the very one then lying idle at the ship-yard wharf, if stationed out in the stream just before the preparations for launching were completed, could have given positive notice and warning to every passing vessel not to go into the danger.

And no matter how many tugs it might require, or what other means might have to be adopted, it is clearly law and common justice that before a man can do so destructive and unlooked for an act as to launch a vessel out into a frequented fair-way, when confessedly he has no control whatever over her after she once starts from the ways, and cannot tell with certainty at what moment she is going to start, or what deflection from her expected course she may take, he is bound at his peril to see that every person is warned who otherwise might innocently, and without gross carelessness, suffer injury.

The building of ships is an enterprise worthy every encouragement; it calls into exercise the highest mechanical skill.

The successful launching of a ship is an event of general interest and pleasure. The skilful ship-builder is among the most praiseworthy of citizens, directly contributing to national and local prosperity, importance, and supremacy; but none the less is he bound by the same rules of care and precaution which the general interests of society has found it necessary to enforce upon every one of its members.

Coming to conclusions indicated by this review of the facts of this case, I am obliged to pronounce in favor of the libellants, and shall sign a decree sending the cause to a master to take an account of the damage sustained by them.

———

The case having been carried to the circuit court on appeal, *Bond*, C. J., affirmed the decree and filed (July 16, 1880,) the following opinion:

BOND, C. J. This cause having been argued by counsel, and submitted upon an agreed statement of the evidence taken in the court below, and upon the facts stated in the opinion of the district court, the court finds the facts to be, that on the afternoon of the first day of July, 1879, the respondents were about to launch the hull of the propeller Arbutus, in the harbor of Baltimore; that notice of the intended launch had been given in the newspapers by the local reporters, by which the public were informed that the Arbutus, a propeller of 150 tons burden, would be launched from the ship-yard of the respondents at 4 o'clock upon the afternoon of that day. A flag was put up to show the location of the ship-yard, and to indicate what was about to be done, and notice was given to all vessels anchored in dangerous proximity to seek safer anchorage. A steam-tug was at the ship-yard for the purpose of towing the Arbutus back after her headway was gone.

The launch did not take place until 5 o'clock. At that time the schooner Ridie, of which the libellants were the owners, was beating out of the harbor, and just as she crossed the line of the launch went into stays.

The men of the ship-yard hallooed at her, and the steam-tug blew its whistle as a warning, but it was too late to prevent the collision. And the court finds the fact to be that there was not sufficient caution upon the part of respondents, and that the collision was occasioned by their negligence; that when a ship-builder is about to launch a vessel, and shoot her with the rapidity of a cannon ball across a crowded harbor, as that is an extraordinary and unusual proceeding, he is required to take extraordinary care, and exercise the highest caution, to prevent damage to those who are navigating that harbor. If the steam-tug, in this instance, had been steaming about to notify sailing vessels not to cross the probable line the Arbutus would take when she was launched, there would have been no likelihood of a collision.

The court finds that the law, as applicable to the facts proved, is that when a collision occurs solely by the fault of a party, he alone must bear the loss and be responsible for the damages which occur. A decree will be passed in accordance herewith.